# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

CALVIN CHILDRESS, et al.,       )
                                       )

               **Plaintiffs,**       )
                                       )

vs.                              )       **Case No.: 6:09-cv-03133-MDH**
                                       )

OZARK DELIVERY OF MISSOURI   )
L.L.C., et al.,                   )
                                     )

               **Defendants.**      )

## ORDER

Before the Court are motions for summary judgment filed by Plaintiffs (Doc. 135) and Defendant Employer Advantage, L.L.C. (Doc. 138). Plaintiffs ask the Court to find, as a matter law, that Plaintiffs are not exempt from FLSA overtime provisions pursuant to the Motor Carrier Act ("MCA") exemption. Defendant Advantage moves the Court for an order finding as a matter of law that Advantage is not Plaintiffs' joint employer under the FLSA. After full and careful consideration of the issues raised and the arguments provided by the parties, the Court hereby **GRANTS** Plaintiffs' motion (Doc. 135) and **DENIES IN PART** Defendant Advantage's motion (Doc. 138).

## BACKGROUND

Plaintiffs Calvin Childress and Jolene Loyd brought the above-captioned lawsuit as a collective action pursuant to Section 216(b) of the Fair Labor Standards Act ("FLSA"). Plaintiffs allege that Defendants willfully violated Section 207 of the FLSA by failing to fully compensate the plaintiff delivery drivers for all hours worked in excess of 40 hours per week. The action is brought against Ozark Delivery, L.L.C. ("Ozark"), Klein Calvert,[1] and Employer

---

[1] Klein Calvert is the managing member and president of Defendant Ozark.

Advantage, L.L.C. ("Advantage")[2] as "joint employers."[3]  The Court conditionally certified the case as a collective action and the class now includes fifty-six (56) opt-in plaintiffs who were drivers allegedly employed by Defendants between April 2006 and June 2009.

Plaintiffs move the court for summary judgment regarding FLSA exemptions.  Plaintiffs argue that the Motor Carrier Act ("MCA") exemption is the sole FLSA exemption asserted by Defendants and that it does not apply in this case because the undisputed evidence shows that Plaintiffs are "covered employees" as defined by the SAFETEA-LU Technical Corrections Act of 2008 ("TCA").  The TCA states that "covered employees," as the term is defined therein, are subject to the FLSA's overtime provisions notwithstanding the MCA exemption.  *See* Pub.L. 110-244, Title III, § 306, June 6, 2008, 122 Stat. 1620.  Defendant Advantage and Defendant Ozark filed suggestions in opposition to Plaintiffs' motion arguing that a genuine issue of material fact exists as to whether Plaintiffs qualify as "covered employees" under the TCA. Defendants rely on Klein Calvert's testimony that some Plaintiffs drove vehicles in excess of 10,000 pounds and some Plaintiffs drove vehicles transporting hazardous materials.

Defendant Advantage separately filed a motion for summary judgment challenging Advantage's alleged status as a joint employer.  Advantage argues that it merely contracted with Defendant Ozark to provide back room human resource services to Ozark between July 25, 2005 and December 23, 2006.  Advantage argues that, even during this limited time period, it does not classify as a joint employer because it exercised no control over Plaintiffs other than maintaining their personnel records and files.  Plaintiffs argue that Advantage is essentially the same

---

[2] Defendant Advantage contracted with Defendant Ozark to perform certain services including human resources, benefits, insurance, risk management, etc.

[3] Ozark and Advantage also filed cross-claims against one another that were previously submitted to arbitration but have not yet been dismissed or otherwise disposed of in this lawsuit.  (Docs. 48-51).

company as "EA Advantage," which entered into a nearly identical service contract with Defendant Ozark effective December 23, 2006 to December 29, 2007; thus, the relevant time period for Advantage's joint employer status is April 2006 through December 2007.

Plaintiffs have also now filed a motion to amend/correct the complaint in order to add EA Advantage as a "d/b/a defendant." (Doc. 160). Plaintiffs argue that Defendant Employer Advantage did business as EA Advantage. Because that issue may affect Advantage's status as joint employer during the time period from December 23, 2006 to December 29, 2007, when EA Advantage provided services to Ozark, the Court defers ruling on that issue at this time. Nonetheless, all other issues in the parties' motions for summary judgment are fully briefed and ripe for review.

## STANDARD

Summary judgment is proper where, viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1359 (8th Cir. 1993). "Where there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party, summary judgment is appropriate." *Quinn v. St. Louis County*, 653 F.3d 745, 750 (8th Cir. 2011). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets the initial step, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To do so, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

3

**ANALYSIS**

After full and careful consideration, the Court finds that the undisputed material facts show as a matter of law that: (1) Plaintiffs were not exempt from the FLSA's overtime provisions pursuant to the MCA exemption, and (2) Advantage qualifies a Plaintiffs' joint employer under the FLSA for the relevant time period of April 2006 to December 23, 2006. The Court defers ruling on whether Advantage also qualifies as Plaintiffs' joint employer for the time period December 23, 2006 to December 29, 2007.

### I. Plaintiffs' Motion for Summary Judgment Regarding Exemptions

The FLSA generally requires employers to pay covered employees engaged in interstate commerce "one and one-half times" their regular rate of pay for all hours worked in excess of forty hours per week. 29 U.S.C. § 207. This "maximum hour" requirement, however, does not protect all employees. Rather, the Act contains certain exemptions that exclude various persons from coverage under Section 207. *See id.* at § 213. Where an exemption is alleged, the employer bears the burden of proving that exemption, which is to be narrowly construed against the employer. *Graham v. Town & Country Disposal of W. Missouri, Inc.*, 865 F. Supp. 2d 952, 956 (W.D. Mo. 2011). As relevant here, one category of exempt employees includes "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49[.]" *Id.* at § 213(b)(1). Section 31502 of Title 49 concerns employees of motor carriers and motor private carriers. *See* 49 U.S.C. § 31502(b). Thus, this FLSA exemption is called the Motor Carrier Act ("MCA") exemption. *See, e.g., McCall v. Disabled Am. Veterans*, 723 F.3d 962, 964 (8th Cir. 2013).

4

Under the MCA exemption, "motor carrier" and "motor private carrier" employees are excluded from the FLSA's overtime pay provisions. The term "motor carrier" is defined as "a person providing motor vehicle transportation for compensation." 49 U.S.C. §§ 13102(14), 31501(2). The term "motor private carrier" describes "a person, other than a motor carrier, transporting property by motor vehicle" where: "(A) the transportation is as provided in section 13501 of this title;[4] (B) the person is the owner, lessee, or bailee of the property being transported; and (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise." *Id.* at §§ 13102(15), 31501(2). In recent years, the scope of the MCA exemption has been affected by various amendments to the definitions of the terms cited above. *See McCall v. Disabled Am. Veterans Ernestine Schumann-Heink Missouri Chapter 2*, No. 11-1298-CV-W-ODS, 2012 WL 3069845, at *2 (W.D. Mo. July 27, 2012) *aff'd sub nom. McCall v. Disabled Am. Veterans*, 723 F.3d 962 (8th Cir. 2013). For example, in August 2005, the Safe, Accountable, Flexible, Efficient Transportation Equity Act ("SAFETEA–LU") went into effect and removed from the definition of "motor carrier" and "private motor carrier" all vehicles weighing less than 10,001 pounds; therefore, employees who drove those vehicles were subject to FLSA overtime provisions. *See id.* Then, in June of 2008, Congress enacted the SAFETEA–LU Technical Corrections Act of 2008 ("TCA"), which "restored the 2004 definition of a 'motor carrier,' but retained the weight limitation for vehicles." *See Wells v. Fedex Ground Package Sys.*, Inc., 979 F. Supp. 2d 1006, 1033 (E.D. Mo. 2013).

The TCA retained the 10,000 weight limitation established under the SAFETEA–LU by including an express provision that extends application of FLSA overtime provisions to all

---

[4] Section 13501 describes the general jurisdiction of the Secretary of Transportation over matters related to "transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier" either across state lines, in a reservation under the exclusive jurisdiction of the United States, or on a public highway. *See* 49 U.S.C. § 13501.

5

"covered employees" notwithstanding the MCA exemption. *See* Pub. L. No. 110–244, Title III,

§ 306(a) (2008); *see also McCall*, 723 F.3d at 964. A "covered employee" as defined in the

TCA is "an individual" who satisfies the following three criteria:

> (1) who is employed by a motor carrier or motor private carrier . . . ;
> (2) whose work, in whole or in part, is defined—
> > (A) as that of a driver, driver's helper, loader, or mechanic; and
> > (B) as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce, except vehicles—
> > > (i) designed or used to transport more than 8 passengers (including the driver) for compensation;
> > > (ii) designed or used to transport more than 15 passengers (including the driver) and not used to transport passengers for compensation; or
> > > (iii) used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of title 49, United States Code, and transported in a quantity requiring placarding under regulations prescribed by the Secretary under section 5103 of title 49, United States Code; and
> (3) who performs duties on motor vehicles weighing 10,000 pounds or less.

Pub. L. No. 110–244, Title III, § 306(c) (2008).

To protect employers, the TCA also contains a limitation on liability for employers who

violated Section 207 within the one-year period from August 10, 2005 to August 10, 2006. *Id.* at

§ 306(b). That safe harbor provision applies only where the employer, as of the date of the

violation, "did not have actual knowledge that the employer was subject to the requirements of

such section with respect to the covered employee." *Id.* Courts hold that the safe harbor

provision is applicable only where the employer's alleged misclassification occurred as the result

of the change in scope of the MCA exemption under the SAFETEA–LU. *See Albanil v. Coast 2

Coast, Inc.*, 444 F. App'x 788, 795 (5th Cir. 2011); *see also Ahle v. Veracity Research Co.*, 738

F. Supp. 2d 896, 912 (D. Minn. 2010) ("if the misclassification occurred as a result of the motor

carrier exemption being inapplicable for a reason unrelated to the weight of the vehicle, the safe-

harbor provision is of no avail.").

6

## A. Undisputed Material Facts[5]

Defendant Ozark provided domestic ground service delivery of packages for client DHL from 2003 to 2009. Ozark based its delivery operations out of various locations within seven different states, including: Missouri, Kansas, Arkansas, Mississippi, Alabama, Kentucky, and Virginia. Ozark employed drivers to operate their delivery vehicles and the company either leased or purchased all of the vehicles that were used by the delivery drivers.

The vehicles that were driven by Ozark employees between 2003 and 2009 included GMC 2500, 3500, and 6500 vans and Ford Econoline 250, 350, and 650 trucks. The GMC 2500 and 3500 vehicles and the Ford Econoline 250 and 350 vehicles had gross vehicle weights less than 10,000 pounds. The GMC 6500 and Ford Econoline 650 had gross vehicles weights greater than 10,000 pounds. The bulk of Ozark's delivery vehicles were the 2500/250 vans, which made up approximately 70-75% of the fleet. During the time period relevant to this suit, Plaintiffs never operated motor vehicles for Ozark that were designed to transport more than eight passengers or that actually transported more than eight passengers. Plaintiffs may have delivered hazardous materials such as liquid flammables, dry ice, and/or blood but they never delivered more than 1,001 pounds of hazardous materials listed on Table 2 in 49 C.F.R. § 172.504. Calvert Dep. 111:24-112:13; Pl.'s Ex. H ¶ 6, ECF No. 150-8.

The specific vehicle driven by an Ozark employee on any given day varied depending on route and volume. Calvert Dep. 19:22-20:4. While all drivers employed by Ozark operated the 2500/250 and/or 3500/350 vehicles at some point, the 6500/650 vehicles were "pretty much" operated by the same twenty persons. Calvert asserts that five of the plaintiffs drove vehicles

---

[5] Where no citation is appended to the specific fact stated herein, the fact was stated in Plaintiff's Statement of Facts was not addressed or controverted by Defendants. *Compare* Pl.'s Brief Supp. Summ. J. 3-7, ECF No. 136 *and* Def. Advantage's Brief Opp. Summ. J. 3-6, ECF No. 140 *and* Def. Ozark's Brief Opp. Summ. J. 1-2, ECF No. 144. Therefore, the Court considers those facts undisputed for purposes of this motion. Fed. R. Civ. P. 56(e)(2).

weighing more than 10,000 pounds but he does not indicate the drivers drove those vehicles exclusively or provide any information as to how often the drivers drove those larger vehicles. The five named plaintiffs who operated the 6500/650 vehicles that weighted more than 10,000 pounds were Andrew Welton, Jeffrey Allen Grimm, Rodney B. Harris, Sammie E. Nabors, and Steve A. Dancy. These Plaintiffs admit that they drove the larger vehicles but state that they also drove the smaller vehicles, which weighed less than 10,000 pounds, either "the rest of the day" or "much more of [the] time" or almost "exclusively."

## B. Application

Based upon the undisputed facts, the Court finds Plaintiffs are "covered employees" under that TCA who are subject to the FLSA's overtime provisions. Plaintiffs satisfy all three criteria to be considered covered employees. First, Plaintiffs are employed by Ozark, who qualifies as a "motor private carrier" under 49 U.S.C. § 13102(15). Ozark acted as a bailee of the property it transported across state lines for the purpose of furthering DHL's commercial enterprise. Second and third, Plaintiffs were drivers of vehicles weighing 10,000 pounds or less and their work "in whole or in part" thereby affected "the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce." Because Plaintiffs satisfy the definition of "covered employee" under the TCA, Plaintiffs are subject to FLSA overtime provisions notwithstanding the MCA exemption.

Defendants argue that summary judgment should be denied because genuine issues of material fact exist as to the weight of the vehicles driven by certain employees and the presence of hazardous materials on those vehicles. As exhibited by the TCA language cited above, an employee is excluded from the definition of "covered employee" if she drives vehicles weighing

8

more than 10,000 pounds or she drives vehicles transporting certain amounts of hazardous materials. The Court finds both of Defendants' arguments unavailing.

First, Defendants argue that the affidavits submitted by Klein Calvert (Docs. 144, 155) create a genuine issue of material fact as to whether the six above-named plaintiffs operated vehicles weighing more than 10,000 pounds. Defendants misunderstand the relevant issue. Where a mixed fleet is involved, the issue for the court is whether the employee spends more than a de minimis amount of time operating vehicles that weigh less than 10,000 pounds. *See, e.g., Wells v. Fedex Ground Package Sys., Inc.*, 979 F. Supp. 2d 1006, 1033 (E.D. Mo. 2013); *Garcia v. W. Waste Servs., Inc.*, 969 F. Supp. 2d 1252, 1259-60 (D. Idaho 2013); *Bedoya v. Aventura Limousine & Transp. Service, Inc.*, 2012 WL 3962935, *4 (S.D. Florida Sept. 11, 2012); *Hernandez v. Alpine Logistics*, LLC, No. 08-CV-6254T, 2011 WL 3800031, at *5 (W.D. N.Y. Aug. 29, 2011).

Here, Calvert's affidavits state only that, upon his recollection, the six above-named plaintiffs were "line haul drivers" who had unique duties and who operated vehicles in excess of 10,001 pounds. Plaintiffs do not deny that these six persons operated vehicles weighing over 10,000 pounds. Rather, Plaintiffs submit evidence showing that the six above-referenced drivers also drove vehicles weighing less than 10,000 pounds more than a de minimis amount of time – i.e. "the rest of the day" or "much more of [the] time" or almost "exclusively." *See* ECF No. 156, 161. Calvert's affidavits do not present any information regarding the *extent* to which plaintiffs operated vehicles less than or greater than 10,000 pounds; therefore, his affidavits fail to create a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986) (nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts.").[6]

Second, Defendant Advantage argues that Plaintiffs' motion lacks an adequate factual basis to support summary judgment because the evidence presented is unclear and/or disputed regarding the Plaintiffs' transportation of hazardous materials. The TCA excludes from the definition of "covered employee" any person who works on vehicles used to "transport[] material found by the Secretary of Transportation to be hazardous under section 5103 of title 49, United States Code, and transported in a quantity requiring placarding under regulations prescribed by the Secretary under section 5103 of title 49, United States Code." Pub. L. No. 110–244, Title III, at § 306(c)(2)(B)(iii). Defendant cites deposition testimony of Klein Calvert that states some routes driven by Ozark employees "needed to be placarded just about daily" and identifies plaintiff Childress as an employee who drove one such route. Calvert Dep. 26:5-17. Calvert testified that Childress "should have been placarded just about daily" because he "did handle flammable materials." Calvert Dep. 26:10-15.

Again, Calvert's testimony is insufficient to preclude summary judgment. Calvert testified that most Ozark employees transported hazardous materials "maybe once or twice a month" at most, and he did not indicate whether those limited situations involved mandatory placarding. Calvert Dep. 25:22-23. Furthermore, Calvert's testimony is insufficient to create a genuine issue of material fact as to Childress. Assuming Calvert's testimony provides sufficient information regarding the extent to which Childress operated vehicles containing hazardous

---

[6] As mentioned during oral argument, Defendant Ozark asks the Court to consider the six plaintiffs who drove the large vehicles "covered employees" subject to the FLSA during the times they drove vehicles 10,000 pounds or less and exempt employees under the MCA during the times they drove vehicles exceeding 10,000 pounds. This type of approach was rejected by the Eighth Circuit. *McCall v. Disabled Am. Veterans*, 723 F.3d 962, 966 (8th Cir. 2013) (quoting *Collins v. Heritage Wine Cellars, Ltd.*, 589 F.3d 895, 901 (7th Cir. 2009)) ("Dividing jurisdiction over the same drivers, with the result that their employer would be regulated under the Motor Carrier Act when they were driving the big trucks and under the [FLSA] when they were driving trucks that might weigh only a pound less, would require burdensome record-keeping, create confusion, and give rise to mistakes and disputes.").

materials, the evidence still fails to show that the placarding allegedly conducted by Childress was "required" under regulations prescribed by the Secretary of Transportation. *See* 49 C.F.R. § 172.502(c). Flammable materials – the hazardous materials allegedly transported by Childress – are included in Table 2 of 49 C.F.R. § 172.504(e). Where hazardous materials contained in Table 2 are transported via highway, placards are not required if the transport vehicle "contains less than 454 kg (1001 pounds) aggregate gross weight of hazardous materials covered by table 2[.]" 49 C.F.R. § 172.504(c). Here, Ozark admitted that Plaintiffs never delivered more than 1,001 pounds of hazardous materials listed on Table 2. Thus, even assuming Childress did regularly transport hazardous flammable materials, the uncontroverted evidence shows that he did not transport them in quantities sufficient to remove Childress from the definition of "covered employee" under the TCA. Accordingly, Defendant Advantage cites no genuine issue of material fact for trial concerning Plaintiffs' transportation of hazardous materials.

As a final note, the Court acknowledges that the time period from April 2006 to August 2006 is subject to the safe harbor provision contained in the TCA. Defendants, however, presented no evidence or argument demonstrating that Plaintiffs were misclassified as exempt employees under the MCA due to the change in scope created by the SAFETEA–LU. Accordingly, Defendants failed to meet their burden to prove the application of the MCA exemption and Defendants are therefore not entitled to avail themselves of the safe harbor provision contained in the TCA.

Based on the foregoing analysis, the Court hereby **GRANTS** Plaintiffs' motion (Doc. 135). The Court finds as a matter of law that Plaintiffs were not exempt employees under the MCA exemption.

## II. Defendant Advantage's Motion for Summary Judgment Regarding Employer Status

The existence of an employer-employee relationship is a prerequisite to asserting a claim under the FLSA. *See* 29 U.S.C. § 216(b). The plaintiff bears the burden of proving that an employer-employee relationship exists. *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1360 (8th Cir. 1993). The FLSA statute broadly defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee. . . ." *Id.* at § 203(d). An employee may have multiple employers that are simultaneously liable under the FLSA where the evidence shows that separate persons or entities exercise some level of control over the employee. 29 C.F.R. § 791.2; *Lochiano v. Compasionate Care*, LLC, No. 10-01089-CV-W-DGK, 2012 WL 4059873 (W.D. Mo. Sept. 14, 2012). The Supreme Court noted that the FLSA defines the employment relationship "expansively" and with "striking breadth." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992). Accordingly, the Act "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Id.* This is due to the Act's remedial nature. *See Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (modified on other grounds).

Whether an entity qualifies as an employer under the FLSA is typically a question a law for the Court. *Solis v. Hill Country Farms, Inc.*, 808 F. Supp. 2d 1105, 1113 (S.D. Iowa 2011) *aff'd*, 469 F. App'x 498 (8th Cir. 2012). Courts determining employer status look to the economic realities of the circumstances rather than technical common law concepts of agency. *Goldberg v. Whitaker*, 366 U.S. 28, 33 (1961). In determining whether an employer is a joint employer under the FLSA, courts within the Eighth Circuit consider the totality of the circumstances. The analysis typically starts with a review of four factors: (1) whether the alleged employer had the power to hire and fire the plaintiff; (2) whether the alleged employer

12

supervised and controlled plaintiff's work schedules or conditions of employment; (3) whether the alleged employer determined the rate and method of payment; and (4) whether the alleged employer maintained plaintiff's employment records. *McClean v. Health Sys., Inc.*, No. 11-03037-CV-S-DGK, 2011 WL 2650272, at *2 (W.D. Mo. July 6, 2011) (citing *Schubert v. Bethesda Health Group, Inc.*, 319 F.Supp.2d 963, 971 (E.D. Mo. 2004).

These factors are not exhaustive and no one factor is dispositive. *See Rikard v. U.S. Auto Prot., LLC*, No. 4:11CV1580 JCH, 2013 WL 5298460, at *3 (E.D. Mo. Sept. 20, 2013); *Saunders v. Ace Mortgage Funding, Inc.*, No. CIV. 05-1437DWFSRN, 2007 WL 4165294, at *4 (D. Minn. Nov. 16, 2007); *see also Irizarry v. Catsimatidis*, 722 F.3d 99, 105 (2d Cir. 2013); *Ellington v. City of E. Cleveland*, 689 F.3d 549, 555 (6th Cir. 2012). For example, the Supreme Court "held that, in certain circumstances, an entity can be a joint employer under the FLSA even when it does not hire and fire its joint employees, directly dictate their hours, or pay them." *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 70 (2d Cir. 2003) (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947)). Although courts apply different and varying factors in applying the economic realities analysis, the overarching concern is whether the alleged employer possessed direct or indirect power to control significant aspects of the plaintiff's employment. *See Jensen v. AT&T Corp.*, No. 4:06-CV-842 (CEJ), 2007 WL 3376893, at *2 (E.D. Mo. Nov. 13, 2007); *see also Saunders*, 2007 WL 4165294, at *4; *Solis v. Hill Country Farms, Inc.*, 808 F. Supp. 2d 1105, 1115 (S.D. Iowa 2011).

### A. Undisputed Material Facts[7]

Ozark is a Missouri limited liability company that provided delivery services for domestic packages in at least seven different states. The president and managing member of

---

[7] Where no citation is appended to the specific fact stated herein, the parties expressly agreed to that fact in their statements of uncontroverted material facts. *See* Consolidated Statement of Facts, ECF No. 154-1.

Ozark was Klein Calvert. On or about July 25, 2005, Ozark entered into an agreement with Employer Advantage ("Advantage"). Under the terms of that agreement, both Ozark and Advantage acknowledged they were entering into a joint employer agreement. The 2005 Agreement between Ozark and Advantage was terminated in December 2006 and Ozark entered into a similar agreement with EA Advantage.[8] *See* Def.'s Ex. E, ECF No. 139-11; Def.'s Ex. L, ECF No. 154-4.

### Terms of Contract between Ozark and Advantage

An agreement was entered into between Ozark and Advantage on July 25, 2005. The parties agreed that it was "their mutual desire and purpose to engage [Advantage] to provide certain off-site human resources to [Ozark's] facility at their location(s)." Def.'s Ex. A, ¶ 6, ECF No. 139-1. The parties acknowledged that they were "entering into a joint employer agreement, and that [Advantage] will enter into a written agreement with each employee recognizing [Advantage's] role as a joint employer." *Id.* at ¶ 6. The parties agreed that "all future hires will become co-employees only upon [Advantage's] receipt of a completed Employer Advantage New Hire Packet." *Id.* at ¶ 14.

Under the terms of the agreement, Ozark retained "a right of direction and control over hiring, termination, discipline, wages, hours of work, and other employment practices necessary to conduct business in a reasonable manner" and Advantage reserved "a right of direction and control over employment practices and procedures to the extent necessary to ensure compliance with said [Federal and State] regulations and [Advantage's employment] guidelines." *Id.* at ¶ 6. Ozark further agreed to cooperate in establishing and implementing a Drug Free Workplace policy/program and to cooperate with Advantage regarding pre-employment and post-

---

[8] EA Advantage is a limited liability company that has similar ownership and management as Advantage but that is not a party to this action.

employment background investigations. *Id.* at ¶ 6. Advantage retained a right of direction and control over employment policies and procedures related to management of safety and risk. *Id.* at ¶ 11.

The parties' agreement goes on to provide that both parties "agree to comply with all applicable labor laws." *Id.* at ¶ 14. Advantage absolved itself from "any responsibility for wage-hour compliance, claimed, in whole or in part, to have occurred *before* the execution or *after* the termination of this Agreement" (emphasis added). *Id.* at ¶ 14. The agreement states that Ozark is obligated to notify Advantage of any claim asserted by an employee or any "government investigation, inquiry, or private adversary action" related to wage-hour compliance. *Id.* at ¶¶ 16-17. Upon termination of the agreement, the parties agreed to "notify all persons employed at [Ozark's] location of the termination of [Advantage's] joint employer responsibilities" and advise employees "that the termination of this agreement does not negate their right to seek subsequent employment or assignment through [Advantage]." *Id.* at ¶ 21(b).

### Terms of Documents Provided to Ozark Employees

During the time that Ozark utilized Advantage's services, some if not all newly hired Ozark employees received Employer Advantage New Hire Packets. *See* Kemp Dep. 25:11-17, 26:21-27:13; *see also* Calvert Dep. 56: 4-18. The New Hire Packet provided Plaintiffs with various documents including the Advantage Employment Agreement, Harassment Policy, and the Employee Handbook. *See* Pl.'s Ex. 4, 25, ECF No. 150-4. Recipients of the new hire packets were instructed to read, sign, date, and return these documents. Pl.'s Ex. 4, 25.

The Employment Agreement explains that "Employer Advantage will be responsible for personnel administrative services" including payroll, taxes, and benefits. Def.'s Exs. D1-D7, ¶¶ 1-2, ECF No. 139-4-10. It states that "this employment relationship between you and Employer

15

Advantage is the result of a written agreement between Employer Advantage and the client business listed above." *Id.* at ¶ 3. The agreement states it will terminate if the written agreement between Advantage and Ozark is terminated. *See id.* Additionally, either Advantage or the employee can terminate the relationship at any time because "this employment relationship is by your mutual consent." *Id.* at ¶ 4. The agreement further states that the employee's direction and supervision will be provided by onsite supervisors. *Id.* at ¶ 5. Furthermore, employee has an obligation under the agreement to provide services to the client business (Ozark), to inform Advantage of disputes between employee and the client business, and to report any onsite injury or unsafe work condition. *Id.* at ¶¶ 5-6.

The Employer Advantage Employee Handbook contains similar language that explains "Employer Advantage serves you as an arms-length personnel department on a day-to-day basis." Pl.'s Ex. 4, ECF No. 150-4 at 28. The handbook states that interviewing, hiring, salary changes, performance evaluations, discipline, terminations, and job assignments are all coordinated through on-site managers. *Id.* at ECF p. 28. However, activities such as payroll, benefit management, and record-keeping are performed by Advantage. *Id.* The handbook states that Advantage is "the general employer for many purposes" and tells employees to list Advantage as their employer of record. *Id.* In the event that Advantage suspends or terminates service with the client business, the handbook states that the employee "will be given the choice of continuing employment at your assigned worksite, or applying for re-assignment as an employee of Employer Advantage." *Id.* at ECF p. 29.

The Employer Advantage Employee Handbook goes on to describe Advantage policies concerning, among other topics: appearance, courtesy, equipment, drug free environment, parking, phone calls, confidential info, endorsements, dishonesty, and employee safety/health.

*Id.* at ECF p. 33-34, 24-25.  The handbook specifically details various provisions related to "pay and hours," including discussions of exempt employees, hours of work, timekeeping, overtime pay, payroll deductions, and paid leave, absenteeism, and leaves of absence.  *Id.* at ECF p. 35-38.  Also included in the handbook are various work rules that "may result in disciplinary actions, up to and including termination," and the employee grievance procedures.  *Id.* at ECF p. 40-42.  The final step of the grievance procedure is a "final and binding" determination by the President of Advantage.  *Id.* at ECF p. 42.

The Advantage Harassment Policy is one-page document that defines sexual harassment, racial harassment, and other forms of harassment, it states that any employee committing harassment is subject to disciplinary action and termination, and it instructs employees who are harassed or discriminated against to immediately contact Advantage or a member of management.  Pl.'s Ex. 4, ECF No. 150-4 at 27.

### Daily Practice

The process for hiring Ozark drivers was as follows: Calvert gave an Ozark manager permission to make a new hire, the Ozark manager received applications and conducted pre-hire drug testing, the pre-hire paperwork was forwarded to Advantage to conduct background checks under a list of criteria provided by Ozark, Advantage advised Ozark whether the applicant met Ozark's pre-hire criteria, and the Ozark manager made the ultimate decision whether to hire the applicant.  Calvert Dep. 39:16-40:9, 75:11-76:15, 91:7-93:2.  Upon being hired, Ozark provided new employees with the new hire packet, which included an employee handbook, payroll information, and the like.  Calvert Dep. 77:21-78:5.  Employees were then trained by Ozark personnel.  *See* Calvert Dep. 103:17-23; Def.'s Ex. K, ¶¶ 19-21.

17

Advantage maintained Ozark employees' human resources files and processed payroll. The names of both Ozark and Advantage appeared on employee paychecks. Def.'s Ex. G, ECF No. 139-13. During the term of the parties' service agreement, Advantage Vice President Russ Kemp was the Advantage employee responsible for ensuring that Ozark was in compliance with wage and hour laws. Calvert Dep. 47:13-48:5. Calvert had at least one conversation with Kemp regarding wage and hour issues.

Ozark supervised Plaintiffs' day-to-day activities, determined Plaintiffs' work schedules and routes, determined the duties Plaintiffs were to perform, and evaluated Plaintiffs' job performance. *See* Calvert Dep. 74:16-19, 99:20-24, 100:24-101:2, 102:13-16, 102:24-103:3, 103:17-104:13; Def.'s Ex. K, ¶¶ 1-3, 7-9, 13-15, 22-24. Calvert and/or Ozark managers also approved Plaintiffs' requests for sick leave and/or vacation time. Def.'s Ex. K, ¶¶ 34-39, ECF No. 154-3; Calvert Dep. 105:16-106:4. Changes in an employee's pay rate were recommended by an Ozark manager and approved by Calvert. Calvert Dep. 90: 15-22. Termination decisions were also recommended by Ozark managers and approved by Calvert. Calvert Dep. 74:20-75:8; Def.'s Ex. K, ¶ 28-30. Employer Advantage never terminated an Ozark employee.

The vehicles driven by Ozark employees were all owned or leased by Ozark. Calvert Dep. 14: 4-18. During the course of the agreement between Ozark and Advantage, Ozark employees did not work at Advantage's premises. Def.'s Ex. K, ¶ 40, ECF No. 154-3. Approximately once per year, someone from Advantage visited each of the Ozark locations to ensure compliance with safety policies and procedures. Calvert Dep. 42:3-6, 45:2-8. During visits, the Advantage representative never spoke directly to an Ozark employee and never directly told any Ozark employee how to do his job. Calvert Dep. 43:10-23. However, the representative did make recommendations, which Calvert relayed to employees. Calvert Dep.

42:6-8, 44:1-4.  On at least a few occasions, Ozark employees directly contacted Advantage concerning their employee rights under the Employer Advantage Handbook.  Calvert Dep. 104:14-105:3.

## B.  Application

Upon review, the Court finds that Advantage acted directly or indirectly in the interest of an employer in relation to Plaintiffs.  Considering the totality of the circumstances, Advantage possessed the power to control significant aspects of Plaintiffs' employment.  The fact that Plaintiffs may have been more dependent on Ozark is irrelevant.  *See, e.g., Torres-Lopez v. May*, 111 F.3d 633, 641 (9th Cir. 1997) ("The issue is not whether a farmworker is *more* dependent upon the farm labor contractor or the grower. Rather, the inquiry must focus on the economic reality of the particular relationship between the farmworker and the alleged joint employer."); *see also Antenor v. D & S Farms*, 88 F.3d 925, 932 (11th Cir. 1996).  Considering also the FLSA's expansive definition of employer and the Act's remedial purposes, the Court holds that Advantage is Plaintiffs' joint employer.

The first critical factor in the circumstances presented here is Advantage's explicit acknowledgement of its role as a joint employer.  Under the economic realities analysis, employer status is not fixed by the labels that the parties attach to their relationship;[9] however, such designations may be relevant in considering the totality of the circumstances, especially

---

[9] *See Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 528-29, 70 S. Ct. 755, 771-72, 94 L. Ed. 1017 (1950) (labels "cannot be decisive"); *Baker v. Stone Cnty., Mo.*, 41 F. Supp. 2d 965, 979 (W.D. Mo. 1999) (labels "not dispositive"); *see also Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013) (labels and contract terms "not govern[ing]"); *Ellington v. City of E. Cleveland*, 689 F.3d 549, 554-55 (6th Cir. 2012) (status "not fixed" by labels); *Thibault v. Bellsouth Telecommunications, Inc.*, 612 F.3d 843, 845-46 (5th Cir. 2010) (contractual designation "not necessarily controlling"); *Cruthis v. Vision's*, No. 4:12-CV-00244-KGB, 2014 WL 282028, at *2 (E.D. Ark. Jan. 24, 2014) (labels "not dispositive"); *Wells v. Fedex Ground Package Sys., Inc.*, 979 F. Supp. 2d 1006, 1021-22 (E.D. Mo. 2013) (contractual designations "not conclusive").

where the alleged employer acknowledged employer status.[10]  Here, Ozark and Advantage

expressly acknowledged that they were "entering into a joint employer agreement, and that

[Advantage] will enter into a written agreement with each employee recognizing [Advantage's]

role as a joint employer."  Not only did Advantage agree with Ozark to be a joint employer, but

it also forwarded new hire documents to Plaintiffs indicating its status as a joint employer.[11]

---

[10] While "'economic reality' rather than 'technical concepts'" is the appropriate test of employment, *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961), this Court finds no binding authority for the proposition that an employer's agreement to be a "joint employer" should be wholly ignored.  In announcing what has become known as the economic realities analysis, the Supreme Court stated:

> Obviously control is characteristically associated with the employer-employee relationship but in the application of social legislation employees are those who as a matter of economic reality are dependent upon the business to which they render service. In Silk, we pointed out that permanency of the relation, the skill required, the investment if the facilities for work and opportunities for profit or loss from the activities *were also factors* that should enter into judicial determination as to the coverage of the Social Security Act. *It is the total situation that controls.*

*Bartels v. Birmingham*, 332 U.S. 126, 130 (1947) (emphasis added).

Defendant cites two non-binding cases to support its proposition that labels and contractual terms regarding employment status are irrelevant.  *See Beck v. Boce Grp., L.C.*, 391 F. Supp. 2d 1183, 1184, 86 (S.D. Fla. 2005); *Jeanneret v. Aron's E. Coast Towing, Inc.,* No. 01-8001-CIV, 2002 WL 32114470, at *3 (S.D. Fla. Jan. 29, 2002).  Both of these cases cite as support an Eleventh Circuit opinion that addressed situations in which the parties had no intention to create an employment relationship.  *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 471 (11th Cir. 1982).  Those types of situations are clearly distinguishable from the case at bar – where the alleged employer expressed an intention to be a joint employer – and implicate greater policy concerns.  *See generally Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981) ("Thus, we have held that FLSA rights cannot be *abridged* by contract or otherwise *waived* because this would 'nullify the purposes' of the statute and thwart the legislative policies it was designed to effectuate." (emphasis added)).

This Court believes the better analysis is that stated by the Supreme Court: "the determination of the relationship does not depend on such isolated factors but rather upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947).  Other courts considering the issue agree that contractual provisions are relevant but not dispositive to such an analysis.  *See Brock v. Superior Care, Inc*., 840 F.2d 1054, 1059 (2d Cir. 1988) ("Though an employer's self-serving label of workers as independent contractors is not controlling . . . an employer's admission that his workers are employees covered by the FLSA is highly probative."); *Solis v. Hill Country Farms, Inc.*, 808 F. Supp. 2d 1105, 1114 (S.D. Iowa 2011) *aff'd*, 469 F. App'x 498 (8th Cir. 2012) ("The contractual term "employee" is not binding on Henry's Turkey Service, but it is evidence of the relationship between it and the workers with disabilities."); *see also Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 667 (5th Cir. 1983) ("Thus, the fact that the plaintiff welders in this case signed contracts stating that they were independent contractors, while relevant, is not dispositive.").

[11] Any argument that Defendant has concerning Plaintiffs' receipt of the new hire documents is rejected.  While Defendant's representative Kemp testified that Ozark employees were not supposed to receive Advantage's New Hire Packet due to an oral agreement between Advantage and Ozark, *see*  Kemp Dep. 25:11-26:8, 26:10-14, 47:1-48:1, no other evidence of this agreement was  submitted to the Court and the existence of that agreement is inconsistent with both Calvert's testimony, Calvert Dep. 56:1-18, 57:12-25, 77:16-78:13, and the client service agreement, Def.'s Ex. A, ¶ 6, ECF No. 139-1.  Moreover, it is undisputed that at least some Plaintiffs received the documents at issue and "returned" them to Advantage. Kemp Dep. 26:21-28:3, 30:3-20.  Furthermore, any separate argument made by Defendant concerning Calvert's competency to testify concerning who received new hire packets

Case 6:09-cv-03133-SRB   Document 163   Filed 03/05/15   Page 20 of 25

Those documents stated that Plaintiffs were entering into an employment relationship with Advantage, that Advantage should be listed as Plaintiffs' employer of record, and that Plaintiffs could apply for re-assignment as an employee of Employer Advantage in the event that Advantage ceased doing business with Ozark. Based on the clarity and extent of Defendant labeling itself as a joint employer, the Court will consider these contractual provisions as relevant but not dispositive.

The next factor to assess in determining Advantage's status as Plaintiffs' joint employer is the role Advantage played in determining Plaintiffs' rate and method of pay. Here, Advantage expressly reserved a right of direction and control over employment practices and procedures to the extent necessary to ensure compliance with federal regulations concerning wages and hours. Advantage further agreed to bear responsibility for wage-hour compliance during the period of its contract with Ozark. Moreover, on at least one occasion, a representative from Advantage provided advice to Ozark owner Calvert concerning wage-hour compliance. Based on the foregoing facts, although Advantage did not generate Plaintiffs' weekly schedules, approve their time paid time off, or determine their individual rates of pay, Advantage did have a significant role in determining general compensation policies and ensuring their compliance with the FLSA. Advantage's participation in determining compensation policies is especially significant in the context of FLSA litigation "because that subject is the focus of this litigation." *See Hembree v. Mid-Continent Transp., Inc.*, No. 08-6094-CV-SJ-HFS, 2011 WL 5841313, at *2 (W.D. Mo. Nov. 21, 2011). In addition, Advantage also had a right to complete knowledge concerning any sort of claim or government investigation related to wages and hours, Advantage processed

---

and handbooks is denied insofar as Calvert identified the typical procedures used by Ozark to provide new hire packets and handbooks to its drivers. The Court notes that Defendant's arguments in this respect are somewhat inconsistent, considering Defendant argues such evidence is inadmissible because it is not based on personal knowledge, yet Defendant also cites Calvert's testimony to support its position concerning who received these documents. *See ,e.g.,* Consolidated Statement of Facts 35, ECF No. 154-1.

payroll, its name appeared on employee checks, and it provided a handbook to Plaintiffs that discussed a variety of pay issues including overtime, exempt employees, and leave. Thus, this factor favors employer status.

An additional factor favoring Advantage's status as an employer is the role that it played in maintaining Plaintiffs' employment records. It is undisputed that Advantage handled taxes, benefits, and record-keeping duties. Advantage acted as an off-site human resource department and was undoubtedly responsible for maintaining Plaintiffs' human resource files and employment records.

Another factor to consider in determining employer status is whether Advantage supervised and controlled Plaintiffs' conditions of employment. Here, the evidence indicates that Ozark provided the vehicles used by Plaintiffs, trained Plaintiffs, supervised Plaintiffs' day-to-day activities, determined Plaintiffs' work schedules and routes, decided the duties Plaintiffs were to perform, and evaluated Plaintiffs' job performance. Although Ozark retained significant control in supervising and controlling Plaintiffs' employment conditions on a day-to-day basis, Advantage did establish certain policies and procedures that conditioned Plaintiffs' employment. For example, Advantage adopted a harassment and discrimination policy; it created safety policies and procedures and conducted on-site inspections to ensure compliance with the same; it established a set of general work rules, prohibited conduct, and grievance procedures; and finally, it drafted an employee handbook containing policies related to a host of topics including equipment, drug-free environment, phone calls, endorsements, parking, absenteeism, etc. Advantage supervised and controlled Plaintiffs' conditions of employment to the extent stated in the above policies. The evidence reveals that, on a few occasions, Ozark employees contacted Advantage directly to discuss these policies.

22

A final factor to consider is Advantage's power to hire and fire employees. Here, the circumstances indicate that Advantage had limited control over hiring and firing decisions. As to new hires, Advantage conducted background checks, provided new hire packets, and received employees' paperwork related to taxes and benefits. As to firing decisions, Advantage created a variety of policies that permitted termination of employees for certain infractions; however, the actual decision to fire pursuant to such policies was made by Ozark. Advantage also had the power to fire an Ozark employee in its role as the final decision-maker in the employee grievance process, and it reserved the right to terminate its employment relationship with Plaintiff at any time.

Considering the foregoing factors and reviewing the totality of the circumstances, the Court finds that Advantage acted in the interest of an employer in relation to the employee-Plaintiffs. Advantage controlled significant aspects of Plaintiffs' employment including maintaining Plaintiffs' employment records, assuring Plaintiffs were paid according to federal wage-hour laws, processing payroll, drafting employment policies concerning a variety of topics related to Plaintiffs' day-to-day activities, and providing administrative services on behalf of Ozark. Moreover, Advantage's contractual terms with both Ozark and Plaintiffs acknowledge that Advantage is Plaintiffs' joint employer. Accordingly, based on these factors and the purposes of the FLSA, the Court finds that Advantage qualifies as a joint employer who is subject to the FLSA. *See White v. 14051 Manchester Inc.*, 301 F.R.D. 368, 388-89 (E.D. Mo. 2014) (joint employer where charged with "insurance, human resources, payroll, and legal matters" including compliance with federal wage/hour laws, and also drafted part of employee handbook, signed paychecks, and involved in hiring two managers but no employees).

23

The cases cited by Defendant Advantage are distinguishable. First, *Loyd v. Ace Logistics, LLC* was before the court on a motion to dismiss and the case was dismissed because plaintiff failed to plead who hired or fired her and who controlled her work conditions; pleading standards are not at issue in the case before the Court and Plaintiffs here provide much more detail than the plaintiff in *Lloyd*. No. 08-CV-00188-W-HFS, 2008 WL 5211022, at *4 (W.D. Mo. Dec. 12, 2008); *compare to McClean v. Health Sys., Inc.,* No. 11-03037-CV-S-DGK, 2011 WL 2650272, at *2 (W.D. Mo. July 6, 2011). Second, *Thornton v. Charter Commc'ns, LLC* addressed whether a cable provider was a joint employer of a technician based on the cable provider's detailed quality control and customer service procedures. No. 4:12CV479 SNLJ, 2014 WL 4794320, at *11 (E.D. Mo. Sept. 25, 2014). There, the court held the procedures cited by plaintiffs did not establish the cable provider as a joint employer because such quality control procedures arose from the nature of the cable business and the need to regulate the nature of services being rendered, all of which was more consistent with a contracting arrangement than an employment relationship. *Id.* at 16. Here, Plaintiffs are not providing a good or service to clients on behalf of Advantage; therefore, quality control measures are not implicated.

Defendant also cites two cases from the United States District Court for the Southern District of Florida. *See Beck v. Boce Grp., L.C.*, 391 F. Supp. 2d 1183 (S.D. Fla. 2005); *Jeanneret v. Aron's E. Coast Towing, Inc.*, No. 01-8001-CIV, 2002 WL 32114470 (S.D. Fla. Jan. 29, 2002). First, these cases are obviously non-binding on this Court. Second, both cases apply a specific eight-factor test including factors different than those analyzed by the Court here. Third, the factual circumstances of those cases are distinguishable from the case at bar. For example, the alleged employer in *Beck* did not expressly acknowledge its role as a joint employer nor did it assume responsibility for ensuring compliance with federal wage-hour standards. *See*

24

391 F. Supp. 2d at 1190-91. *Jeanneret* is factually distinguishable for the same reasons as *Beck* and it is further distinguishable because the alleged employer in *Jeanneret* did not draft employment handbooks to give to employees that contained employment policies or conditions. 2002 WL 32114470, at *6-8.

In sum, the Court finds, based upon the totality of the circumstances and careful review of the relevant economic realities factors, that Defendant Advantage qualifies as Plaintiffs' joint employer under the FLSA for the time period of April 2006 to December 23, 2006. As stated previously, the Court defers ruling on the issue of whether Defendant Advantage qualifies as a joint employer during the time period from December 23, 2006 to December 29, 2007. Therefore, Defendant Advantage's motion for summary judgment (Doc. 138) is **DENIED IN PART**.

**DECISION**

Based on the foregoing analysis, Plaintiffs' Motion for Summary Judgment (Doc. 135) is **GRANTED** and Defendant Employer Advantage, L.L.C.'s Motion for Summary Judgment (Doc. 138) is **DENIED IN PART**.

**IT IS SO ORDERED.**

Dated:  March 5, 2015                    */s/ Douglas Harpool*
                                          **DOUGLAS HARPOOL**
                                          **UNITED STATES DISTRICT JUDGE**